## Rhoads' Estate.

*Wills—Proof of wills—Witnesses to execution.*

The proponent of a reproduction of an alleged last will and testament, the original having been lost, does not meet the burden of proof of due execution of such will by producing two witnesses, one of whom testifies that he, with the other, at the decedent's request signed as a witness a paper purporting to be her will, without having heard the will read and in ignorance of its contents or the number of pages it was written on so that there was nothing by which he could identify it as the will offered for probate.

Argued March 3, 1913. Appeal, No. 360, Jan. T., 1912, by Clara V. Lance, from decree of O. C. Berks Co., March T., 1912, No. 33, in Estate of Anna Louisa Rhoads, deceased. Before FELL, C. J., BROWN, MESTREZAT, STEWART and MOSCHZISKER, JJ. Affirmed.

Petition to set aside letters of administration and to

admit to probate a reproduction of a lost will of decedent.

The following opinion was filed by BLAND, P. J.:

The original petition of Clara V. Lance for the revocation of the letters of administration issued to John J. Kutz, and for the admission to probate of the alleged substantial copy of the will of Anna Louisa Rhoads, the decedent, executed, as alleged, on November 28, 1900, was filed with the register on December 8, 1910, more than ten years after the execution of the alleged will. The uncontradicted testimony is that the alleged will was placed in a sealed envelope, on the day of its execution, November 28, 1900, and there remained until its alleged destruction in 1909.

In order to establish a duly executed and unrevoked will of a decedent, lost or destroyed without the decedent's knowledge and consent, it is necessary to establish three facts: (1) The due execution of the alleged will by the decedent; (2) its contents substantially, as set forth in its alleged reproduction; and (3) that the instrument was unrevoked at the decedent's death: Michell v. Low, 213 Pa. 526; Foster's Appeal, 87 Pa. 67. From this it is manifest that the first fundamental obligation of the party seeking to establish, in this State, an unrevoked will destroyed without the knowledge and consent of the testator, is, to establish clearly its lawful execution according to the requirements of our statute of wills. The sixth section of the Act of April 8, 1833, P. L. 249, prescribes those requisites thus: "Every will shall be in writing, and unless the person making the same shall be prevented by the extremity of his last sickness, shall be signed by him at the end thereof or by some person in his presence, and by his express direction; and in all cases, shall be proved by the oaths or affirmations of two or more competent witnesses, otherwise such will shall be of no effect."

In passing upon and fixing the qualifications of witnesses contemplated by this statute, our courts have

uniformly followed the standard declared by Gibson,
C. J., in Hock v. Hock, 6 S. & R. 47; i. e., "The execu-
tion of a will must be proved by two witnesses, each of
whom must separately depose of all facts necessary to
complete the chain of evidence; so that, if one witness
only were required, the will would be fully proved by
the evidence of either." In this case it is alleged that
the destroyed will was witnessed by G. C. Horning and
W. P. Saylor. The register, in a well-considered and
clear opinion, decided that the witness, W.. P. Saylor,
was unable to testify that the alleged reproduction of
the destroyed will, contained in exhibit "A," attached to
the petition of Clara V. Lance, and propounded by her
for probate as a reproduction in substance of the de-
stroyed will of the decedent, was, in fact, a substantial
reproduction of such will, for the reason that he never
had any knowledge of the contents of the will, and was
therefore ignorant upon the question as to whether there
was a substantial identity between the contents of the
destroyed will and its alleged reproduction propounded
for probate.

The question for decision by the register, and which
recurs, in this court, on this appeal, was, whether or not
the witness, Saylor, had such a knowledge of the will
executed by the decedent November 28, 1900, as enabled
him to testify that exhibit "A" contained dispositions
substantially identical with dispositions contained in
the said will of November 28, 1900. The question in-
volved necessary comparison between two things, one of
which things was the will of November 29, 1900, a knowl-
edge of which was indispensable to the act of compar-
ison involved. Without a knowledge of some of the
characteristic contents of the will of 1900, the thing to
be proved, there was no ground of comparison in the
mind of Saylor, and he could not identify the contents
of the exhibit as a reproduction of the contents, or some
of the contents, of the will which he says he witnessed.
He was a fair and honest witness; but I think his testi-

mony demonstrates his want of knowledge of any fact which would enable him to say that the exhibit propounded for probate as a reproduction of the will alleged to have been executed by the decedent November 28, 1900, is in fact, identical in substance, with anything contained in the alleged will. A concise reference to his testimony will, I think, make this manifest. He testified to the part he took in the execution of the alleged will, and his knowledge of it, as follows:

That he was, when he testified May 19, 1911, twenty-nine years of age; that on May 1, 1899, he entered the employment of the Reading Iron Works, in the Furnace Department; that he worked under Gilbert C. Horning, the chief clerk; that he saw Gilbert C. Horning copying "something special" on the typewriter; that Horning "folded it up carefully, put it in an envelope, and asked me to go along to Mrs. Rhoads' house to witness a will"; it was about 1900—the day before Thanksgiving Day; that he went with Horning to Mrs. Rhoads' house; that after they entered the house he was introduced to Mrs. Rhoads, and that then she and Mr. Horning "spoke a few words; then she asked me to be a witness to the will"; that Mr. Horning produced the will from his pocket, enclosed in the envelope; she looked over the will ten or fifteen minutes; that he did not hear what she and Mr. Horning said, "because I did not stand very near at the time; she only said she wanted me to sign her will"; that he signed as a witness in compliance with her request; that Mr. Horning signed first as a witness, and that Mrs. Rhoads signed the will herself before they signed as witnesses, in their presence; that after they had all signed, the will was enclosed in the same envelope by Mr. Horning, and that envelope was then sealed; that Mrs. Rhoads said nothing to him, but paid him two dollars for signing the will as a witness; that she also paid Mr. Horning; that she said they should keep as quiet as possible; she said there was a certain party coming back the next day, and that she

wanted the will fixed up before that party came back on that day—that was Thanksgiving Day; that she named the party, but that he could not remember the name, but it was a woman. On cross-examination, he testified that he had never seen Mrs. Rhoads before. "Q. This was eleven years ago, and until a very recent time you have had no reason to think of it? A. No, sir, until a recent time. Q. That is, from the time that these things occurred until, we will say, within a year, until after Mrs. Rhoads' death, you had no occasion to recall it to your recollection, or think of it, or speak of it to anybody? A. No, sir, not to speak or think of it. Q. Then you found a lady in the room, and what was said; did Mr. Horning introduce you? A. He introduced me to Mrs. Rhoads. Q. That is to say, he said 'Mrs. Rhoads, this is Mr. Saylor'? A. Yes, sir. Q. And that's the only means you had of knowing it was Mrs. Rhoads? A. Yes, sir...... Q. Then did you remain together, Mrs. Rhoads and you and Mr. Horning—or did you withdraw? A. I withdrew to the back part of the room. Q. Were they in the front part of the room? A. They were in the front part...... I walked around away from them until they were through talking. Q. To give them an opportunity to do some talking? A. Yes, sir. Q. Did you hear what was said? A. No, sir. Q. You didn't want to hear. A. No, sir. Q. You did not regard it as proper to listen? A. No, sir....... Q. You fixed the day before Thanksgiving Day, didn't you, eleven years ago—on the day before Thanksgiving Day, to the best of your recollection? A. To the best of my recollection. Q. Until Mrs Rhoads died, that circumstance had never been recalled to your mind, by any conversation or anything that happened? A. No, sir. Q. But when Mrs. Rhoads died, some one came to see you about the thing? A. Yes, sir. Q. Who was that? A. Mr. Horning. Q. Gilbert C. Horning? A. Yes, sir, Gilbert C. Horning. Q. And then for the first time the matter was talked about, as to when this was? A. Be-

tween Mr. Horning and myself? Q. Yes. A. Not particularly so; he simply brought back to my mind what occurred; that is what he came to tell me. Q. He came back to ask you to recall the circumstances? A. Yes, sir, of signing the will. Q. Wasn't the date discussed then? A. No, sir. Q. Wasn't the day spoken of at that time? A. It might have been spoken of in the course of the conversation. Q. Who saw you next about the matter? A. Mr. John A. Keppelman. Q. Was the date spoken of in that conversation? A. They asked me what date I thought it was; and I said, as near as I could recall about 1900. Q. How did you fix the date? A. According to the time I was at the Keystone furnace and transferred to my present position,...... Q. And that is the way you fix it? A. Yes, sir. Q. Have you no other way of fixing it, or is that the only way you have of fixing it? A. That's all I can recall...... Q. Didn't Mr. Keppelman discuss that with you? A. He asked me whether I recalled the year, and I said if I were to estimate the year, I would say about 1900, according to the particulars I have already given....... Q. You went there (as clerk) on the first of May (1899) and about a year afterwards, what happened? A. They changed the offices—about a year—it wasn't two years. Q. We understand about a year afterwards, the offices were changed. How does that enable you to fix the date at 1900? A. When Mr. Horning told me about that, that came back to my mind—the change of the offices about one year afterwards. That's about the only way, and the nearest I can get to it. Q. Is that the whole process by which you get at it? A. Yes, sir, the whole process by which I can judge. Q. If the process is wrong, you're wrong as to the date? A. It might be a year or two; it might be 1901, according to the process I have gone through...... Q. You can't say that during the time, from the time of the happening of this thing, until the time of Gilbert Horning's coming to see you, you ever thought of this thing? A. Never gave it a

thought.  Q.  Never talked to anybody about it, and you
don't recall it ever coming to your mind?  A.  Never;
had practically forgotten it."  He testified that he knew
nothing about the contents of the will, or how many
sheets of paper it consisted of, whether it "was two—
three or four or how many"; but that he saw Mrs.
Rhoads sign it, and that he read her name.

It will be observed that there is nothing in the testi-
mony of Mr. Saylor, tending to show that he ever saw
exhibit "A," which purports to be the substance, pro
tanto, of the will which he attested about 1900.  So
far as the testimony in the cause shows, he and Mr.
Horning were the only persons who ever saw that will;
and that will is the thing to be proved in this case.  The
question whether exhibit "A" is a reproduction, in sub-
stance, pro tanto, of the will executed about 1900, in-
volves the very essence of the appellant's case, yet the
testimony of Mr. Saylor entirely ignores the exhibit and
its contents.  In the proof of all wills, whether existent,
or lost or destroyed, identification of the document is
an indispensable and, indeed, fundamental element of
proof by two witnesses.  Each witness must identify
it.  In Hock v. Hock (6 S. & R. 47) the alleged will
existed, and Charrington, its scrivener, seems to have
signed it as a witness; at least, the court admits that he
was a fully qualified witness.  The testator went to
Rodernel, in his field where he was making hay, "and
said that Charrington had made his will," and that he
wished him, Rodernel, to go with him and sign it as a
witness.  Rodernel told him he could not leave his work,
and the testator then said "it would do any other time."
It was decided that there was not enough in the con-
versation of the testator and Rodernel, descriptive of
the particulars, to enable Rodernel to identify the docu-
ment for probate, as the will mentioned by the testator
in his declarations to Rodernel.  GIBSON, C. J. (p. 48),
said: "The defect in it is, that there is nothing to show
that the declarations of the testator referred to the will

produced. Charrington may, for anything that appears, have drawn more than one will. Take it that he swears that he drew but one......still that part of the case would depend on the evidence of but one witness. Strike out Charrington's evidence, and how will the case stand? There would be a very material link wanting to connect the testator's declarations with the paper in question."

Now, let us supply the same test to the evidence of the appellant in this case, by striking out Mr. Horning's evidence; and what have we? We have nothing but the testimony of Mr. Saylor, that about 1900 he with Mr. Horning, witnessed a will of Mrs. Rhoads, signed by her in their presence; of the contents of which will he knew nothing beyond the signature of Mrs. Rhoads. But his status and value as a witness are fixed by the state of his knowledge. His knowledge is limited to the solitary fact that he signed as a witness to a will made by Mrs. Rhoads about the year 1900. The court is now asked to declare exhibit "A" to be, pro tanto, a reproduction of the will witnessed by Mr. Saylor. He knows nothing about the contents of the will he witnessed, and so far as his testimony goes, nothing about exhibit "A," its alleged reproduction in part.

Now, it is clear that, in order to establish this disputed will, at least two witnesses must testify to such a knowledge of its contents, as to enable each of them to identify the contents of exhibit "A" as a substantial reproduction of like provisions contained in the disputed will: and that in the absence of proof by two witnesses, each possessing such knowledge of the contents of the disputed will, as to enable him to identify the contents of exhibit "A" as a substantial reproduction of like contents of the disputed will, it must in the language of the statute, be held to "be of no effect." In this case, the testimony of Mr. Saylor established only one fact,—that about the year 1900 he witnessed a will for Mrs. Rhoads, and beyond that he knows nothing. His knowl-

edge of the will of Mrs. Rhoads, falls far short of the knowledge shown by Stewart of the will of Tolhurst, in the case of Michell v. Low, et al., 213 Pa. 526, where Mr. Justice MESTREZAT said: "If we strike out the testimony of Miss Naser, Stewart's testimony would be wholly insufficient to identify exhibit 'A' as a copy of the will signed as attesting witness. Not having the original paper before him, and not knowing its contents by reading it, or having it read, all that he possibly could testify to it, that he, with Miss Naser, witnessed a will signed by Tolhurst, in Michell's office in the spring or summer of 1900. It is true Stewart said he signed but one will, and Miss Naser said exhibit 'A' is a copy of the will that both signed, but, as in the Hock case, she alone can identify exhibit 'A' as the paper signed by both, and that is not sufficient." Under the decisions in Hock v. Hock (6 S. & R. 47) and Michell v. Low (213 Pa. 526), it is clear that, assuming for the sake of argument that Mr. Horning is a fully qualified witness to testify to the execution and contents of the will of Mrs. Rhoads, and that he identifies the contents of exhibit "A" as a reproduction pro tanto, of her will, he is the only witness in the case qualified by knowledge as a "competent" witness; and that standing alone, his testimony is insufficient in law to prove the will in dispute. The kind and quality of evidence necessary to establish a lost or destroyed will is illustrated in Foster's App., 87 Pa. 67, where a lost will was established upon grounds stated by Chief Justice AGNEW, as follows: "That the contents of this will are clearly and fully proved, both by testimony and by written memoranda in the testator's own handwriting, is equally plain, and no question arises as to the number of witnesses, the contents being proved by two, as well as by the memoranda furnished by the testator himself."

The contrast presented by that case, and the cases of Hock v. Hock, Michell v. Low and this case, is so palpable, that comment would be useless. The decision of

the register, refusing to vacate the letters of administration granted to John J. Kutz, and to admit to probate exhibit "A" as a reproduction of an alleged last will of Anna Louisa Rhoads, is affirmed, and the appeal therefrom dismissed at the cost of the appellant.

*Error assigned* was in affirming the decision of the register dismissing the appeal.

*John A. Keppelman,* with him *Frank Jacobs* and *Isaac Hiester,* for appellant.

*Cyrus G. Derr,* with him *Ellwood H. Deysher,* for appellee.

OPINION BY MR. JUSTICE MESTREZAT, May 12, 1913:

The law applicable to this case has recently been discussed and determined in Michell v. Low, 213 Pa. 526. The learned judge of the Orphans' Court has so clearly demonstrated the correctness of his conclusion in an exhaustive opinion dealing with the facts and the law that a lengthy discussion of the questions raised by the assignments of error is unnecessary.

It was incumbent on the appellant to establish the due execution of the will, its contents substantially as set forth in the alleged reproduction, and that it was unrevoked at the decedent's death. The sixth section of the Act of April 8, 1833, P. L. 249, provides that in all cases a will "shall be proved by the oaths or affirmations of two or more competent witnesses, otherwise such will shall be of no effect." Each of the witnesses must separately depose to all facts necessary to complete the chain of evidence: Hock v. Hock, 6 S. & R. 47, and the execution of the will must be proved by the testimony of two witnesses before its contents can be proved.

The appellant failed to meet these essential requisites of her case. Horning and Saylor were the two wit-

nesses offered to prove the execution of the will. Saylor's testimony did not show that he witnessed the execution of the will offered for probate. His testimony.is correctly summarized in the opinion of the court below, and it is manifestly insufficient to prove that the will he witnessed is the will produced by appellant. According to his testimony, Horning asked him to go to Mrs. Rhoads' house and witness a will, that when they arrived at the house he was introduced to Mrs. Rhoads whom he had never met before, that after she and Horning spoke a few words she asked Saylor to be a witness to the will, that Horning produced the will from his pocket enclosed in an envelope and after she signed it Saylor and Horning witnessed it and Horning returned it to the envelope which he sealed. Saylor witnessed the will when he was about seventeen years of age and about twelve years before he testified. He testified that he did not know the contents of the will he witnessed nor the number of sheets of paper it was written on.

It is apparent that Saylor could not and did not testify that he witnessed the will produced by the appellant. He did not hear the will read, and was entirely ignorant of its contents, and hence there is nothing by which he could identify it as the will offered for probate. It had been destroyed and hence he could not identify it by his signature. The most that can be said of Saylor's testimony is that it shows he and Horning witnessed a will executed by Mrs. Rhoads. It does not show that they witnessed the will produced for probate. There is nothing in his testimony that identifies the will produced by appellant as the will he saw Mrs. Rhoads sign. He has no knowledge of what became of the will he signed after Horning put it in his pocket. So far as he knows that will is still in existence. He does not know that it has been destroyed. It may yet turn up with an entirely different disposition of the decedent's estate from that made in the will in controversy. It was essential to the appellant's case that she

met the burden imposed on her by proving the due execution of the will she offered for probate. Until she made such proof, the question of the sufficiency of the proof of the contents of the will executed by Mrs. Rhoads did not arise.

The decree is affirmed.