## Orlady's Estate.

## Orlady, Appellant, *v.* Orlady.

Argued September 25, 1939. Before KEPHART, C. J., SCHAFFER, MAXEY, LINN, STERN and BARNES, JJ.

*Richard H. Gilbert,* with him *W. B. Simpson,* of *Simpson & Simpson,* for appellant.

*Swirles L. Himes,* with him *C. Jewett Henry,* for appellee.

OPINION BY MR. JUSTICE LINN, November 27, 1939:

There are two appeals, one from a common pleas judgment for the contestant, and the other, from an orphans' court decree sustaining contestant's appeal from the register and setting aside a decree of probate. Miss Orlady suffered a severe stroke June 17, 1937; she died February 7, 1938, leaving surviving two brothers, the parties to these appeals. On the day after her death, Frederick L. Orlady, hereafter called proponent, offered for probate an instrument dated August 21, 1937, purporting to be executed by mark, together with a codicil dated December 31, 1937, similarly executed; letters testamentary were granted to him and another, named as executors. George Phillips Orlady—hereafter called the contestant—on February 10, 1938, appealed from the probate. On his petition, an issue was granted to determine "1. Whether or not at the time of the execution of the said writings the decedent was a person of sound mind; 2. Whether or not the said writings were procured by undue influence, duress and constraint practiced upon the said Edith T. Orlady by Frederick L. Orlady and others. 3. Whether or not said writings are the will and codicil of the said decedent; . . ."[1] After an extended trial the jury answered the three questions in favor of the contestant. Proponent's motions for a new trial and for judgment n. o. v. were

---

[1] As to submitting a question in this form see *Tranor's Estate,* 324 Pa. 263, 188 A. 292.

refused. In disposing of them, the learned trial judge referred to the fact that at the trial the contestant presented a point for a directed verdict in his favor and concluded that such an instruction should have been given on the ground (in the words of his opinion) that "the will and codicil in question, of Edith T. Orlady, were not properly executed in accordance with the requirements of the Act of June 7, 1917, P. L. 403, Section 3." Accordingly, he made an order in the orphans' court proceeding sustaining the appeal from the decree of the register.[2]

As our decision depends entirely on the inadequacy of proof of execution, we need not now deal with want of testamentary capacity and effect of undue influence.

The Wills Act of 1917, P. L. 403, 20 PS section 192, increased the quantum of proof required by the Act of 1848, P. L. 16, for the probate of testmentary writings executed by mark. Section 3 provides—"If the testator be unable to sign his name, for any reason other than the extremity of his last sickness, a will to which his name is subscribed in his presence, by his direction and authority, and to which he makes his mark or cross,

[2] Decedent also left a will dated October 15, 1930. In his opinion refusing proponent's motion for a new trial, the learned judge said: "In conclusion, under all the facts and circumstances in this case, we feel that the jury passed upon the questions involved after due deliberation and arrived at a just verdict. The proponent is amply provided with the income of one-half of the estate for life under the will of his sister, dated October 15, 1930, which will was made at a time there is no question as to her mental capacity or her freedom from duress, and of which there can be no question as to her desire in disposing of her estate and providing for her two brothers, who in each instance under that will get a life estate. To allow the will and codicil in question to stand (which scrivener describes as complex and dealing in multitudinous things) would be in effect to turn over this estate of considerable size to the almost exclusive control in one in whom testatrix expressed herself as lacking confidence and trust up to the very time she suffered the severe stroke, which seriously impaired her physically and it is contended mentally as well."

unless unable so to do,—in which case the mark or cross shall not be required,—shall be as valid as though he had signed his name thereto: Provided, That such will shall be proved by the oaths or affirmations of two or more competent witnesses." The significant words requiring that the testator's name be "subscribed in his presence" were not in the earlier act.

Miss Orlady was confined to her bed at the time of the transaction. The only persons present when she made her mark to the instruments were herself and the two subscribing witnesses, one, the scrivener, and the other, a physician. Both testified and, as has more than once been said, they are to be regarded not as partisan, but as the court's witnesses: *Szmahl's Estate,* 335 Pa. 89, 6 A. (2d) 267. The sufficiency of the execution was therefore properly raised;[3] it is always in issue in such a trial. Whether these papers were executed in conformity with the Wills Act must be tested by their testimony. Taking the codicil first, we all agree that their evidence leaves no doubt whatever that decedent's name was not subscribed to it in her presence; her name appears on the paper in typewriting only and the evidence is that there was no typewriting machine in the room; her typewritten name was therefore not subscribed in her presence; it must have been placed on the paper before it was brought into her room.

When we come to the evidence of the execution of the proposed will, we are met with the rule recently applied in several cases (*Kelly's Estate,* 306 Pa. 551, 160 A. 454; *James's Estate,* 329 Pa. 273)[4] and stated long ago by GIBSON, C. J., in *Hock v. Hock,* 6 S. & R. 46: "Proof of execution must be made by two witnesses,

---

[3] Compare *Plotts's Estate,* 335 Pa. 81, 5 A. (2d) 901; *Szmahl's Estate,* 335 Pa. 89, 6 A. (2d) 267.

[4] See also *Derr v. Greenawalt,* 76 Pa. 239; *Simrell's Estate,* 154 Pa. 604, 26 A. 599; *Rhoads's Estate,* 241 Pa. 38, 88 A. 71; *Hodgson's Estate,* 270 Pa. 210, 112 A. 778; *Hughes's Estate,* 286 Pa. 466, 133 A. 645; *Hunter's Estate,* 328 Pa. 484, 196 A. 35.

each of whom must separately depose to all the facts necessary to complete the chain of evidence, so that no link in it may depend on the credibility of but one." In *James's Estate,* 329 Pa. 273, at page 276, 198 A. 4, we said: "That it is necessary, where a will is not signed by the testator, for each of two witnesses to prove that testator's name was subscribed in his presence and by his direction and authority was ruled in *Grabill v. Barr,* 5 Pa. 441; *Asay v. Hoover,* 5 Pa. 21, and *Kelly's Estate,* 306 Pa. 551. In the last named case the two subscribing witnesses testified they saw the testatrix make her mark, but did not see her name subscribed to the will nor hear her request anyone to write it for her. The proponent thereupon offered to prove by the scrivener that, having read the will to the testatrix, he wrote her name thereon at her express direction, and then, in the presence of the two subscribing witnesses, she affixed her mark. It was held, nevertheless, that the validity of the will was not established, because there were not two witnesses to prove that the name of testatrix had been subscribed in her presence and by her direction and authority."

Concerning the execution of the will, the scrivener gave, inter alia, the following testimony: "I said to her, I asked her whether she was able to write with her left hand.[5] She said No. I knew her right hand was paralyzed, so we got a magazine or book and laid it on the bed in front of her. I took her hand or put her hand on the pen. I wrote her signature. I put her

---

[5] But it would seem that the scrivener was cognizant of this fact when he prepared the Will at his office, for it contained the following: "IN WITNESS WHEREOF, I have to this my last will and testament, written in typewriting . . . set my hand and seal this Twenty-first day of August, A. D. 1937, but by reason of affliction of my right hand and arm, and being unable to write my signature with my left hand, I have hereunto signed this will with my cross-mark." A similar provision appears in the draft of the codicil.

hand on the pen and made the x mark for her. Then I asked her, Do you want Dr. Mainzer and I to sign this will as witnesses. She said yes. We then signed as witnesses." In passing, it may be said, that his evidence is not clear whether he meant by "I wrote her signature" that he wrote it after he "got a magazine and laid it on the bed in front of her," or whether it had been written on the paper by him before he brought it into the room to receive the testatrix's mark; but we treat the case as if he meant to say he wrote her name in her presence.

As to the codicil, he said: "The codicil was signed. Signed with her x mark. Dr. Mainzer and I signed as witnesses." Of this evidence it will be noted, that the phraseology "The codicil was signed" if intended to refer to her name, as distinguished from placing her mark on it, described an act done in typewriting before the codicil was produced, because there was no typewriting machine in the room.

Dr. Mainzer, after referring to the scrivener's going over the contents of the will with Miss Orlady, said: "And after the last paragraph was read or digested, he asked if she could sign the will. She said she could not sign it. He asked if she could write with her left hand. She said, No I can't . . . Mr. Henderson then asked if she would mark an x before her name. She said she would so he proceeded to put the pen in her hand. He got a magazine off the stand and put the paper on it and with the aid of his hand she made an x before her name. Q. What was said, if you recall? A. The next matter taken up, I signed the will and so did Mr. Henderson."

With respect to the codicil, Dr. Mainzer testified: "She again put her mark on the paper as on the will previously and I signed the paper in conjunction with Mr. Henderson."

In cross-examination he said: "Q. After Mr. Henderson attached the mark of Miss Orlady to the will I pre-

sume you and Mr. Henderson signed your names as witnesses? A. Yes. We did. Q. Is that true as to both the codicil and will? A. Yes, sir. Q. Therefore I presume Mr. Henderson wrote her name around her mark? A. Of Miss Orlady? Q. Yes. A. I believe that was there before he had her attach her mark. Q. In each instance he wrote her name, is that correct? A. It may be— Q. Did he write her name on the will? A. I presume so. By the Court: There is no dispute as to that. Mr. Henderson said he did. By Mr. Himes: It may be material. Q. Doctor, was there any typewriter in the room? A. Not that I saw. Q. Doctor, did you see Mr. Henderson write the name of Miss Orlady on both the will and codicil? A. I did not. Q. Did you see him write it on the will? A. I don't remember if I saw him at all. It was on the will or paper. Q. It wasn't written in your presence? A. Her name? Q. Yes. A. Her x was marked. Q. Her name? A. I don't recall whether it was. Q. You are not sure of that? A. I wouldn't be absolutely sure at this time."

If the scrivener's statement "I wrote her signature" is read as referring to the time when Miss Orlady made her mark, we shall have one witness testifying to execution in conformity with the statute. But it is clear that Dr. Mainzer was unable to testify that he saw her name "subscribed in his presence". On the contrary, he has no recollection of it. When we consider how conclusive the proof is, based on the evidence of this witness, that her name to the codicil, being in typewriting, could not have been subscribed in her presence because there was no typewriting machine in the room, we are impressed with the apparent care with which this witness was narrating the facts of the transaction. Directly asked in cross-examination (a question not put to him during the examination in chief) whether he had seen the scrivener "write the name of Miss Orlady on both the will and codicil" he replied "I did not". When asked whether he could separate the signing of

the will from the signing of the codicil, he could not do so. The proof of the proponent therefore fails to bring the transaction within the requirements of the Wills Act.

The judgments appealed from are affirmed, costs to be paid by appellant.